UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 15 Case |
| FAIRFIELD SENTRY LIMITED, *et al.*, | Case No. 10-13164 (SMB) |
| Debtors in Foreign Proceedings. | Jointly Administered |
| FAIRFIELD SENTRY LIMITED (IN LIQUIDATION), acting by and through the Foreign Representatives thereof, | Adv. Proc. No. 10-03496 (SMB) |
| Plaintiffs, | Administratively Consolidated |
| -against- | |
| THEODOOR GGC AMSTERDAM, *et al.*, | |
| Defendants. | |

**MEMORANDUM DECISION AND ORDER REGARDING THE DEFENDANTS' MOTIONS TO DISMISS FOR WANT OF JURISDICTION**

**A P P E A R A N C E S:**

BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036

David J. Molton, Esq.
Marek P. Krzyzowski, Esq.
Of Counsel

KELLOGG, HANSEN, TODD, FIGEL
& FREDERICK, P.L.L.C.
1615 M. Street, N.W., Suite 400
Washington, D.C. 20036

Michael K. Kellogg, Esq. (admitted *pro hac vice*)
Aaron M. Panner, Esq. (admitted *pro hac vice*)
Of Counsel

*Attorneys for Plaintiffs*

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006

Thomas J. Moloney, Esq.
Of Counsel

HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022

Marc J. Gottridge, Esq.
Of Counsel

MOSES & SINGER LLP
405 Lexington Avenue
New York, NY 10174

Alan Kolod, Esq.
Of Counsel

CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, NY 10019

Jeff Butler, Esq.
Of Counsel

*Attorneys for Defendants*[1]

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge**

Plaintiffs Kenneth M. Krys and Charlotte Caulfield (together, the "Liquidators"),[2] in their capacities as foreign representatives of Fairfield Sentry Limited ("Sentry"), Fairfield Sigma Limited ("Sigma"), and Fairfield Lambda Limited ("Lambda," and

[1] The listed attorneys for the Defendants participated at the oral argument; additional defense counsel are set forth in Appendix E to the *Consolidated Memorandum of Law in Opposition to Plaintiffs' Motion for Leave to Amend and in Support of Defendants' Motion to Dismiss*, dated Jan. 13, 2017 ("*Defendants Motion*") (ECF Doc. # 960).

[2] Different individuals have served as Liquidators of the Funds. When used in this memorandum decision, the term refers to the individuals serving in the position during the referenced time-period.

collectively, the "Funds") seek leave to amend their complaints, (*see Memorandum Of Law in Support of Motion for Leave to Amend*, dated Oct. 21, 2016 ("*Liquidators Motion*") (ECF Doc. # 923)), in 305 adversary proceedings pending in this Court in which the Liquidators seek to recover redemptions paid by the Funds to the defendants (collectively, the "U.S. Redeemer Actions").[3]  The defendants in the U.S. Redeemer Actions (collectively, the "Defendants") oppose the amendments and seek dismissal of the U.S. Redeemer Actions for lack of subject matter jurisdiction, lack of personal jurisdiction, and for failure to state a claim.  (*See Defendants Motion*.)  For the reasons set forth herein, the Defendants' motion to dismiss for lack of subject matter jurisdiction is denied, and the motion to dismiss for lack of personal jurisdiction is granted to the extent that personal jurisdiction is based solely on the forum selection clause in the Subscription Agreements (defined below).  Finally, the balance of the motion to dismiss, which challenges the merits of the Liquidators' claims, must await the disposition of further proceedings discussed at the end of this opinion.  The Liquidators' motion for leave to amend is deferred pending resolution of Defendants' dismissal arguments based on the failure to state a claim.

---

[3]       A list of all U.S. Redeemer Actions is attached as Appendix D to the *Foreign Representatives' Memorandum of Law in Opposition to Defendants' Consolidated Memorandum of Law and in Further Support of Foreign Representatives' Motion for Leave to Amend Complaints*, dated Mar. 31, 2017 ("*Liquidators Reply*") (ECF Doc. # 1336).  The U.S. Redeemer Actions were administratively consolidated for pretrial purposes.  (*See Amended Order Authorizing the Consolidation of Redeemer Actions Pursuant to Federal Rule of Bankruptcy Procedure 7042*, signed Nov. 17, 2010 (ECF Doc. # 25).)  Unless otherwise specified, references to docket entries are to documents filed on the electronic docket of the consolidated proceeding, *Fairfield Sentry Limited (In Liquidation) v. Theodoor GGC Amsterdam*, Adv. Proc. No. 10-03496 (SMB).

## BACKGROUND

### A. The Funds and the BVI Liquidation

The pre-2012 background pertaining to these proceedings is set forth in *Fairfield Sentry Ltd. (In Liquidation) v. Theodoor GGC Amsterdam* (*In re Fairfield Sentry Ltd.*), 452 B.R. 64, 69-73 (Bankr. S.D.N.Y. 2011) ("*Fairfield I*") and *In re Fairfield Sentry Ltd. Litig.*, 458 B.R. 665, 671-72 (S.D.N.Y. 2011) ("*Fairfield II*"), familiarity with which is assumed. The Court highlights only those facts relevant to the disposition of the motions before it.

The Funds were organized under the laws of the British Virgin Islands ("BVI"). *Fairfield II*, 458 B.R. at 671. Sentry sold shares to foreign investors and invested virtually all of the proceeds with Bernard L. Madoff Investment Securities LLC ("BLMIS"). *Id*. Sigma and Lambda were "funds of funds." They also sold shares to investors, but invested the proceeds with Sentry which, in turn, invested those funds with BLMIS. The investors could redeem their shares at will, and the redemption payment amounts were based on a calculation of net asset value ("NAV") per share which depended, for the most part, on the value of Sentry's investment with BLMIS. *Id*.

In December 2008, Madoff admitted to operating the investment advisory business of BLMIS as a Ponzi scheme, and BLMIS was placed into a liquidation proceeding pursuant to section 78eee of the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq*. *Fairfield I*, 452 B.R. at 69. In hindsight, the Funds had overpaid the earlier redemptions (and overcharged the earlier subscribers) based on an erroneous view of the value of their BLMIS investments, and after Madoff's arrest, they ceased making redemption payments. *Id*. Certain of the Funds' creditors and shareholders

commenced insolvency proceedings against the Funds in the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Island ("BVI Court") in February and April 2009, and the BVI Court appointed the Liquidators as the Funds' fiduciaries. *Id*. at 69-70. On June 14, 2010, the Liquidators commenced ancillary proceedings in this Court under Chapter 15 of the Bankruptcy Code to obtain recognition of the BVI liquidation proceedings as "foreign main proceedings" under sections 1502(4), 1515, and 1517 of the Bankruptcy Code. *Id*. at 70. The Court granted the Liquidators' applications on July 22, 2010. *In re Fairfield Sentry Ltd.*, 440 B.R. 60, 63-66 (Bankr. S.D.N.Y. 2010), *aff'd*, No. 10 Civ. 7311(GBD), 2011 WL 4357421 (S.D.N.Y. Sept. 16, 2011), *aff'd*, 714 F.3d 127 (2d Cir. 2013).

**B. The U.S. Redeemer Actions**

In April 2010, and prior to recognition, the Liquidators began commencing numerous actions in New York state court on behalf of the Funds against a subset of the Defendants. *Fairfield II*, 458 B.R. at 672. Typically, the Defendants were banks that purchased shares in the Funds they thereafter resold to their customers. *Id*. at 671-72. The banks were the registered owners of the shares, but their customers who acquired the shares were the beneficial owners, and were also sued as Defendants. *Id*. at 672. The Liquidators asserted claims based on money had and received, unjust enrichment, mistaken payment, and constructive trust (the "Common Law Claims"), but the theory of each claim was the same: the Funds had miscalculated the NAV, and consequently, paid inflated redemption prices. *Id*.

Following recognition of the BVI liquidations under Chapter 15 of the Bankruptcy Code, the Liquidators removed the state court actions to the District Court pursuant to

28 U.S.C. § 1452(a),[4] and the District Court referred the actions to this Court under the standing order of referral then in effect. *See Standing Order of Referral of Cases to Bankruptcy Judges*, M-61 (Ward, Acting C.J.) (S.D.N.Y. July 10, 1984) (as amended, the "District Court Standing Order of Reference").[5] The Liquidators filed substantially similar adversary proceedings against other Defendants under the umbrella of the Chapter 15 case, and the Court administratively consolidated the newly filed cases and the removed cases (*i.e.* the U.S. Redeemer Actions). *Fairfield II*, 458 B.R. at 672. The Liquidators also amended certain of the complaints in the U.S. Redeemer Actions to assert avoidance claims under sections 245 and 246 of the BVI INSOLVENCY ACT of 2003 ("INSOLVENCY ACT") to claw back redemptions paid with inflated prices as "unfair preferences" and/or "undervalue transactions" (the "BVI Avoidance Claims"). *Id.* As noted, 305 U.S Redeemer Actions are pending and seek an aggregate recovery of over $6 billion.

A group of Defendants subsequently moved to remand the removed actions to state court based, *inter alia*, on mandatory abstention under 28 U.S.C. § 1334(c)(2).[6]

---

[4] Section 1452(a) of Title 28 states that "[a] party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title."

[5] The 1984 standing order was superseded in early 2012 following the Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011). *See Amended Standing Order of Reference Re: Title 11*, 12 misc. 00032, M10-468(LAP) (S.D.N.Y. Jan. 31, 2012). The changes do not affect the automatic referral of the U.S. Redeemer Actions to this Court.

[6] Section 1334(c)(2) of Title 28 provides

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

*Fairfield II*, 458 B.R. at 672. The Bankruptcy Court denied the motion, but the District Court reversed the Bankruptcy Court's order. Chief District Judge Preska ruled that the claims asserted in the U.S. Redeemer Actions were not subject to a bankruptcy court's "core" jurisdiction, *Fairfield II*, 458 B.R. at 688-89, she assumed that they were "non-core," *id.* at 690, and remanded the proceedings to the Bankruptcy Court to reconsider whether the cases were subject to mandatory abstention under 28 U.S.C. § 1334(c)(2). *Id*. at 691. The Defendants subsequently withdrew their remand request, and the U.S. Redeemer Actions are before this Court. (*See Notice of Withdrawal of Motions to Remand and for Abstention*, dated Jan. 13, 2017 (ECF Doc. # 954).)

### C. The BVI Redeemer Actions

Less than a month after the District Court's remand order in *Fairfield II*, this Court entered an order staying the U.S. Redeemer Actions, (*see Amended Order Staying Redeemer Actions*, dated Oct. 19, 2011 (ECF Doc. # 418)), pending further developments in suits brought by the Liquidators against redeemers in the BVI Court, a subject to which I now turn.

The procedure for purchasing and redeeming Fund shares was set forth in the Amended and Restated Articles of Association (the "Articles").[7] Article 10 described the procedure for the redemption of shares. Upon receipt of a written redemption request, the Fund was obligated to redeem or purchase the Member's shares at the Redemption

---

[7] A copy of Sentry's Articles is attached as Ex. F to the *Declaration of William Hare in Support of Motion for Leave to Amend*, dated Oct. 21, 2016 ("*Hare Declaration*") (ECF Doc. # 925). The Articles for Sigma and Lambda are substantially similar to Sentry's and are attached as Exs. D and E to the *Attorney Declaration of Thomas J. Moloney in Opposition to Plaintiffs' Motion for Leave to Amend and in Support of Defendants' Motion to Dismiss*, Jan. 13, 2017 ("*Moloney Declaration*") (ECF Doc. # 961).

Price. (Article 10(1) & (1)(b).) The Redemption Price for each share was the NAV per share, (Article 10(2)), and the NAV per share was determined by dividing the value of the Fund's net assets by the number of outstanding shares. (Article 11(1)[b][8].) "Any certificate as to the Net Asset Value per Share or as to the Subscription Price or the Redemption Price therefor given in good faith by or on behalf of the Directors shall be binding on the parties." (Article 11(1)[c].)[9] The surrender of any certificate issued in respect to the shares to be redeemed was a condition to Fairfield's obligation to pay the Redemption Price. (Article 10(3)(a).)[10]

In late 2009 and early 2010, the Liquidators commenced actions against shareholders in the BVI Court (the "BVI Redeemer Actions") to recover other redemptions paid to shareholders based upon a mistaken NAV. (*See Statement of Claim* in *Fairfield Sentry Ltd. (In Liquidation) v. Bank Julius Baer & Co. Ltd.*, dated Mar. 12, 2010, at ¶ 9 (attached as Ex. A to the *Hare Declaration*).) The Liquidators alleged that the actual value of the shares was nominal, and the shareholders were "unjustly enriched" and were "liable to make restitution" to the Liquidators. (*Id*. at ¶¶ 10-11.)

8 Bracketed letters following Article 11(1) reference subparagraphs of that Article with "[a]" being the first subparagraph and so forth.

9 The Subscription Price for the purchase of shares under Article 9 was also governed by the NAV per share determined under Article 11.

10 The redemption obligation was subject to several other conditions, but they are not relevant to the dispute before the Court.

**1. The Preliminary Issues Proceeding**

In early 2011, certain defendants in the BVI Redeemer Actions filed applications requesting that the BVI Court hold a trial to determine "preliminary issues." A preliminary issues trial is a mechanism for deciding specific issues that are likely to resolve the case. (*Hare Declaration* at ¶ 23; *Declaration of Phillip Kite in Opposition to Plaintiffs' Motion for Leave to Amend and in Support of Defendants' Motion to Dismiss,* signed Jan. 12, 2017 ("*Kite Declaration*"), at ¶ 9 (ECF Doc. # 963).) On April 20, 2011, Judge Bannister of the BVI Court ordered a trial on two preliminary issues, (1) whether various documents issued to the investors constituted certificates of NAV within the meaning of Article 11 ("Certification Issue"), and (2) whether redeeming investors gave good consideration for the redemption payments by surrendering their shares ("Good Consideration Issue"), and stayed the BVI Redeemer Actions pending a determination of such preliminary issues.

On September 16, 2011, Judge Bannister ruled that the various communications sent to investors by the Fund's administrator, Citco Funds Services (Europe) BV ("Citco"), and/or the Fund's manager, Fairfield Greenwich (Bermuda) Limited were not certificates as set forth in the Articles, *Fairfield Sentry Ltd. (In Liquidation) v. Bank Julius Baer & Co. Ltd.*, Nos. BVIHC (COM) 30-2010, *et al.*, ¶ 33 ("*BVI Court PI Decision*"),[11] but the redeemers had given good consideration for the redemptions by surrendering their shares. (*Id.* at ¶ 36.) On June 13, 2012, the Eastern Caribbean Court of Appeal ("ECCA") affirmed on both issues and dismissed the appeals. *See Quilvest*

[11] A copy of the *BVI Court PI Decision* is attached as Ex. B to the *Kite Declaration*.

*Fin. Ltd. v. Fairfield Sentry Ltd. (In Liquidation)*, Nos. HCVAP 2011/041, *et al.* ("*ECCA PI Decision*").[12]

The parties appealed to the Privy Council, which rendered its decision on April 16, 2014. *See Fairfield Sentry Ltd. (In Liquidation) v. Migani*, [2014] UKPC 9 ("*Migani*").[13] Initially, the Privy Council opined that, while the lower courts had reviewed the Certification Issue and the Good Consideration Issue separately, the issues "are closely related and have to be considered together." *Id.* at ¶ 6. Furthermore, the claims to recover the redemptions were governed by the Articles and BVI law, *id.* at ¶ 17, and although the subscribers had signed subscription agreements (discussed below) that included a New York choice of law provision, "none of the questions raised by the preliminary issues depends on the terms of the Subscription Agreement. They depend wholly on the construction of the Articles, which is governed by the law of the British Virgin Islands." *Id.* at ¶ 20.

The Privy Council disagreed with the lower courts' disposition of the Certification Issue. The Liquidators had taken the position that the Articles did not require the Funds to issue a certificate in connection with a redemption request. That implied that the Funds could simply compute the NAV per share without issuing a certificate, and pay the Redemption Price. In the cases before the Privy Council, the Liquidators argued that the Funds had not issued a certificate, were not bound by the NAV per share

---

12 A copy of the *ECCA PI Decision* is attached as Ex. G to the *Kite Declaration*.

13 A copy of the *Migani* decision is attached as Ex. Q to the *Hare Declaration*. An electronic version of the opinion without paragraph numbers can be found on the Westlaw database at 2014 WL 1219748.

calculated at the time of the redemption, and could seek to recover the inflated payments that only came to light following Madoff's arrest. *See id.* at ¶ 22.

The Privy Council rejected the Liquidators' position based on the doctrine of finality. The Articles contemplated that the subscription and redemption prices would be "definitively ascertained" at the time of the subscription or redemption "whether or not the determination was correctly carried out in accordance with Articles 11(2) and (3)." *Id.* at ¶ 24. The notion that the directors had the discretion to redeem without issuing a certificate in some cases and not in other cases served no rationale purpose because the purpose of the certification was to lend finality to the purchase or redemption. *Id.* at ¶ 26. Furthermore, unless a certificate was issued, it would always be possible to vary the NAV per share calculated by the Directors at the time of the redemption based on subsequently acquired information. *Id.* at ¶ 23. Accordingly, any document intended to be a definitive determination of the NAV per share at the time of the redemption was a certificate. *See id.* at ¶¶ 29-31. Therefore, the Privy Council reversed the lower courts' holdings on the Certification Issue, and dismissed the appeal of the Good Consideration Issue. *Id.* at *Conclusion*. In 2016, the Liquidators received approval to discontinue the BVI Redeemer Actions and served notices of discontinuance on the defendants. (*Hare Declaration* at ¶ 68.)

**2. The Section 273 Proceeding**

Having won the preliminary issues proceeding, certain defendants from the BVI Redeemer Actions applied in the BVI Court to prevent the Liquidators from proceeding with the U.S. Redeemer Actions. They invoked section 273 of the BVI Insolvency Act, which states that "[a] person aggrieved by an act, omission or decision of an office

holder [*e.g.*, a liquidator] may apply to the Court and the Court may confirm, reverse or modify the act, omission or decision of the office holder." INSOLVENCY ACT § 273. Alternatively, the defendants sought an anti-suit injunction preventing the Liquidators from prosecuting the U.S. Redeemer Actions.

BVI Court Judge Leon denied the application on March 11, 2016, *see UBS AG N.Y. v. Fairfield Sentry Ltd.*, Nos. BVIHC (COM) 2009/0136, *et al.* ("*BVI Court 273 Decision*"),[14] ruling that the defendants lacked standing because they were seeking to advance their interests as Defendants in the U.S. Redeemer Actions instead of as stakeholders in the BVI liquidations of the Funds. *Id*. at ¶¶ 71-72. But even if they had standing, they had failed to sustain their burden, *id*. at ¶ 136, and an anti-suit injunction was inappropriate because the U.S. Bankruptcy Court could determine the portions of the U.S. Redeemer Actions that could proceed. *Id*. at ¶ 142. The applicants appealed to the ECCA, which affirmed the BVI Court's decision on November 20, 2017. *See ABN AMRO Fund Servs. (Isle of Man) 24 Nominees Ltd. v. Krys*, Nos. BVIHCMAP: 11-16, 23-28 of 2016, at ¶ 82 ("*ECCA 273 Decision*").[15]

**D. The Current Motions**

The Liquidators now seek leave to further amend their complaints in the U.S. Redeemer Actions. (*See Liquidators Motion*.) They contend that discovery has yielded proof showing that Citco lacked good faith when it issued the certificates for the redemptions involved in the U.S. Redeemer Actions. (*See Declaration of David J.*

---

14 A copy of the *BVI Court 273 Decision* is attached as Exhibit S to the *Hare Declaration*.

15 A copy of the *ECCA 273 Decision* is attached to the *Letter of David J. Molton, Esq.* dated Nov. 22, 2017 (ECF Doc. # 1603).

*Molton in Support of Motion for Leave to Amend*, dated Oct. 21, 2016 ("*Molton Declaration*") at ¶ 5 (ECF Doc. # 924).) They contend that if the certificates were not issued in good faith, they would not be binding under Article 11(1)[c]. (*Liquidators Motion* at 28-29.)

The proposed amended complaint in *Fairfield Sentry Ltd. v. Citigroup Global Mkts. Ltd.*, Adv. Proc. No. 11-02770 (SMB) ("*Proposed Citigroup Complaint*") (attached as Exhibit C to the *Molton Declaration*) is typical. The Liquidators' theory remains unchanged: the redemption payments were based on inflated NAVs per share resulting from an erroneous belief as to the value of the Funds' investments with BLMIS. (*Id*. at ¶¶ 7, 10, 33-35, 93.) The key addition, as mentioned, is the allegation that Citco — as the Funds' administrator —issued the NAV certificates in bad faith for purposes of Article 11(1). (*Id*. at ¶¶ 41, 70.)[16] The Liquidators seek to recover the redemption overpayments from the Defendants as the registered owners of the shares and/or the Defendants' unknown clients as beneficial owners, based on (i) unjust enrichment, money had and received, mistaken payment, constructive trust, and declaratory judgment (*i.e.*, the Common Law Claims), (ii) unfair preferences or undervalue transactions under section 245 and 246 of the INSOLVENCY ACT, (*i.e.*, the BVI Avoidance Claims) and (iii) breach of contract and breach of the implied covenant of good faith and fair dealing (*i.e.*, the "Contract Claims"). (*Id*. at ¶¶ 94-209.)

[16] The allegations describing Citco's bad faith have been filed under seal. (*See Order Authorizing the Foreign Representatives to File Proposed Amended Complaints in Partially Redacted Form and Unredacted Proposed Amended Complaints Under Seal*, dated Sept. 6, 2016 (ECF Doc. # 909).) The specific allegations do not need to be unsealed for purposes of this omnibus proceeding.

The Defendants oppose the amendments and seek dismissal of the U.S. Redeemer Actions in their entirety. (*See Defendants Motion*.) They contend that the Court lacks subject matter jurisdiction over the proceedings and personal jurisdiction over the Defendants. (*Defendants Motion* at 17-35.) In addition, the complaints failed to state claims upon which relief can be granted because the redemptions are protected by the safe harbor in 11 U.S.C. §§ 546(e) and 561(d), (*id*. at 36-44), the claims are barred by the doctrines of *res judicata* and/or collateral estoppel, (*id*. at 44-54), any bad faith on the part of Citco is imputed to the Funds and recovery is barred under the doctrine of *ex turpi causa*, (*id*. at 54-55), the Funds failed to allege the existence of an injury on the Common Law and Contract Claims, (*id*. at 58-61), and the BVI Avoidance Claims fail as a matter of law. (*Id*. at 61-70.)

Given the more than 300 U.S. Redeemer Actions, the Court entered an order scheduling oral argument on the following issues common to all U.S. Redeemer Actions:

1. Does the Court have "related to" jurisdiction over these adversary proceedings under 28 U.S.C. § 1334(b)?

2. Which, if any, of the plaintiffs' claims in their proposed, amended complaints are barred by 11 U.S.C. §§ 546(e) and 561(d)?

3. Did the defendants that executed subscription agreements (or are otherwise bound by the terms of the subscription agreements) consent to this Court's *in personam* jurisdiction?

4. What claims or issues, if any, are precluded by virtue of the prior proceedings among the parties (including proceedings involving a subset of the parties)?

5. Is Citco, *et al*.'s alleged bad faith imputed to the plaintiffs, and if so, how does the plaintiffs' bad faith affect its right to pursue the claims asserted in the proposed, amended complaints?

6. Is a defendant entitled to an offset to the extent it purchased shares in the Funds based on inflated NAVs resulting from BLMIS' fraud?

(*See Order Scheduling Oral Argument on Motions for Leave to Amend and to Dismiss*, dated Jan. 9, 2018 ("*Scheduling Order*") (ECF Doc. # 1609).)

The Court heard oral argument on January 25, 2018, (*see Transcript of January 25, 2018 Hearing* ("*Hr'g Tr.*") (ECF Doc. # 1648)), and took the matter under advisement.

## DISCUSSION

### A. Subject Matter Jurisdiction

Pursuant to section 1334(b) of title 28, the District Court has "original but not exclusive jurisdiction of all civil proceedings arising under" the Bankruptcy Code, or "arising in" or "related to" a bankruptcy case. The District Court may refer civil proceedings to the Bankruptcy Court, 28 U.S.C. § 157(a), and the District Court for Southern District of New York does so automatically under the District Court Standing Order of Reference. The District Court held that the U.S. Redeemer Actions neither "aris[e] under" the Bankruptcy Code, *Fairfield II*, 458 B.R. at 675-76, nor "arise in" the Funds' Chapter 15 cases, *id*. at 676-87, and assumed but did not decide that the actions were "related to" the Chapter 15 cases. *Id*. at 689.

A civil proceeding is "related to" a bankruptcy case "if the action's outcome might have any conceivable effect on the bankrupt estate." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 339-40 (2d Cir. 2018) (quoting *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011)). When the debtor is an entity involved in a foreign insolvency proceeding, the "estate," for purposes of determining whether "related to" jurisdiction exists is the foreign estate. *Parmalat*, 639 F.3d at 579 ("In the context of §

1334(b), there is no need to distinguish between estates administered principally in foreign forums and those administered principally in domestic forums."); *accord Hosking v. TPG Capital Mgmt., L.P.* (*In re Hellas Telecomm. (Lux.) II SCA*), 524 B.R. 488, 515 (Bankr. S.D.N.Y. 2015) (applying the *Parmalat* ruling to a Chapter 15 debtor). Here, the "conceivable effect" of the U.S. Redeemer Actions on the Funds' BVI estates is obvious: any recovery will directly increase the size of the foreign estates. The Defendants have conceded this point. (*Hr'g Tr.* at 8:14-20.)

The Defendants nonetheless assert that the Court's "related to" subject matter jurisdiction in a Chapter 15 case is limited to a proceeding that seeks to recover U.S. assets, and the U.S. Redeemer Actions seek to recover foreign assets. (*See Defendants Motion* at 20; *Consolidated Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss*, dated May 26, 2017 ("*Defendants Reply*") at 3 (ECF Doc. # 1457).) They point out that unlike plenary bankruptcies, a bankruptcy court may only exercise territorial jurisdiction over a Chapter 15 debtor's property located in the United States. *See, e.g.*, 11 U.S.C. § 1520(a)(1) (applying sections 361 and 362 of the Bankruptcy Code to the debtor's U.S. assets); 11 U.S.C. § 1520(a)(2) (applying sections 363, 549 and 552 of the Bankruptcy Code to transfers of the debtor's U.S. assets); 11 U.S.C. § 1521(a)(5) (permitting the entrustment of the administration or realization of the debtor's U.S. assets to the foreign representative); 11 U.S.C. § 1521(b) (allowing the foreign representative to distribute the debtor's U.S. assets upon receipt of Court-approval); 11 U.S.C. § 1528 (limiting the effect of a Chapter 15 debtor's plenary bankruptcy filing to its U.S. assets). The Defendants seek to engraft this territorial limitation to the Second Circuit's ruling in *Parmalat*. (*Defendants Reply* at 3

("*Parmalat* dealt only with 'related to' jurisdiction over an action seeking to recover assets located in the United States.").)

The Defendants' argument confuses subject matter jurisdiction over a proceeding with a court's *in rem* jurisdiction over property. "Subject-matter jurisdiction defines the court's authority to hear a given type of case." *United States v. Morton*, 467 U.S. 822, 828 (1984). As stated above, this Court's exercise of subject matter jurisdiction over the U.S. Redeemer Actions is governed by 28 U.S.C. § 1334(b) and, as noted above and conceded by the Defendants, the outcome of the U.S. Redeemer Actions may have a conceivable effect on Funds' estates. The *Parmalat* ruling — that the relevant estate for a foreign debtor is the foreign estate — is not limited to the recovery of U.S. assets; all that is required for the exercise of "related to" jurisdiction is the satisfaction of the "conceivable effect" test, "[n]othing more." 639 F.3d at 579, 579 n. 7. Accordingly, the Court concludes that it has "related to" subject matter jurisdiction over the U.S. Redeemer Actions.

## B.    Personal Jurisdiction

"In order survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." *SPV Osus*, 882 F.3d at 342 (quotation marks and citation omitted). A court has "considerable procedural leeway" when considering a pretrial motion to dismiss for lack of personal jurisdiction: "[i]t may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)). "Prior to

discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction. At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations." *Id.* at 84-85 (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). The Court construes the pleadings and affidavits "in the light most favorable to the plaintiffs, resolving all doubts in their favor." *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (quoting *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008)).

Two-hundred six defendants (referred to in the *Defendants Memo* as the "Foreign Defendants") have moved to dismiss the complaints on the ground that the Court lacks personal jurisdiction over them. (*See Defendants Motion*, Appendix B-1.) Although the question of personal jurisdiction must be decided on a defendant-by-defendant basis, the Liquidators assert that a large number of these Defendants consented to jurisdiction in New York by signing identical Subscription Agreements[17] containing a forum selection clause in favor of New York courts and a submission to jurisdiction in New York. (*Liquidators Reply* at 4-11.)[18] Further, they allege that an additional 192 Defendants who were the beneficial owners of the shares consented to jurisdiction, (*Liquidators Reply* at 11 & Appendix D-1), because each subscriber represented that it had authority to sign on behalf of such beneficial owners. (*See*

---

17 A sample Subscription Agreement is attached as Exhibit A to the *Moloney Declaration*.

18 The Liquidators also assert personal jurisdiction over the Defendants based on purposeful contacts with the U.S. (*Liquidators Reply* at 11-18.) The Court did not schedule oral argument with respect to this issue because the relevant considerations vary on a case-by-case basis, and the purpose of this proceeding was to consider dismissal matters common to most or all of the U.S. Redeemer Actions.

Subscription Agreement at ¶ 27.) Because this issue applied across the board, the Court carved it out for separate consideration.

Parties may consent to personal jurisdiction by entering into contracts with forum selection clauses, *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006), and a forum selection clause is enforceable "unless it imposes a venue 'so gravely difficult and inconvenient that [the plaintiff] will for all practical purposes be deprived of his day in court.'" *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 561 U.S. 89, 110 (2010) (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 18 (1972)).[19] The Defendants do not argue that it would be gravely difficult or inconvenient to defend these actions in New York where they are represented by experienced and able counsel. Instead, they contend that the Liquidators' claims do not come within the forum selection clause.

The Subscription Agreements contain a limited consent to the jurisdiction of New York courts:

> *New York Courts*. Subscriber agrees that any suit, action or proceeding ("Proceeding") *with respect to this Agreement and the Fund* may be brought in New York. Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum.

---

19 New York law similarly "encourages parties to international commercial agreements to select New York as a forum regardless of other contacts with the state." *Saeco Vending, S.P.A. v. Seaga Mfg., Inc.*, No. 15-cv-3280 (AJN), 2016 WL 1659132, at *5 (S.D.N.Y. Jan. 28, 2016) (citing N.Y. GEN. OBLIG. LAW § 5-1402)).

(Subscription Agreement at ¶ 19 (emphasis added).) Thus, the Subscriber consented to the forum and to personal jurisdiction in the forum.

As the emphasized language indicates, the Defendants' consent to jurisdiction was limited to any actions "with respect to this Agreement and the Fund," which the Defendants' maintain is not the case. They note that that the Privy Council ruled in *Migani* that the Subscription Agreements and New York law were irrelevant to the Liquidators' right to recover the redemption payments, and hence, the U.S. Redeemer Actions are not "with respect to" the Subscription Agreement. (*Defendants Motion* at 25-26.)

The Liquidators make two responses. First, "and," as used in the italicized clause, should be read in the disjunctive to cover proceedings "with respect to" *either* the Subscription Agreement *or* the Fund, and the Defendants do not dispute that the U.S. Redeemer Actions are "with respect to" the Funds. (*Liquidators Reply* at 6-7.) Second, the U.S. Redeemer Actions are "with respect to" the Subscription Agreement. (*Id.* at 7-8.)

**1. "And" *vs*. "Or"**

When asked to interpret contractual language, the question is "whether the contract is unambiguous with respect to the question disputed by the parties." *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010) (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)). Ambiguity presents a question of law. *Maverick Tube*, 595 F.3d at 465-66. A contract is ambiguous if it "could suggest more than one meaning when viewed

objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Int'l Multifoods,* 309 F.3d at 83 (internal quotation marks omitted); *accord Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir. 2010); *Maverick Tube*, 595 F.3d at 466. An agreement is not ambiguous if it has a definite and precise meaning, and unambiguous language does not become ambiguous because a party urges a different interpretation that strains the language beyond its ordinary meaning. *Maverick Tube*, 595 F.3d at 467; *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992). Where the dispute concerns a provision of the contract, the Court must consider the contract "as a whole to ensure that undue emphasis is not placed upon particular words and phrases." *Bailey v. Fish & Neave*, 868 N.E.2d 956, 959 (N.Y. 2007); *accord Maverick Tube,* 595 F.3d at 468.

If the contract is ambiguous, "'the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.'" *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275-76 (2d Cir. 2000) (quoting *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's,* 136 F.3d 82, 86 (2d Cir. 1998)). "Ambiguity without the existence of extrinsic evidence of intent presents not an issue of fact, but an issue of law for the court to rule on." *Williams & Sons Erectors, Inc. v. S.C. Steel Corp.*, 983 F.2d 1176, 1184 (2d Cir. 1993). The parties have represented that no such extrinsic evidence exists, (*Hr'g Tr.* at 46:13-15; 52:25-53:3), and consequently, the interpretation of the Subscription Agreement presents a pure question of law.

"Words and phrases are to be given their plain and ordinary meaning, and New York courts will commonly refer to dictionary definitions in order to determine that meaning." *Summit Health, Inc. v. APS Healthcare Bethesda, Inc.*, 993 F. Supp. 2d 379, 390 (S.D.N.Y. 2014), *aff'd*, 725 F. App'x 4 (2d Cir. 2018); *accord Archie MD, Inc. v. Elsevier, Inc.*, 16-cv-6614 (JSR), 2017 WL 3421167, at *4 (S.D.N.Y. Mar. 13, 2017). The dictionary definition of "and" is conjunctive. *See* WEBSTER'S THIRD INTERNATIONAL DICTIONARY (UNABRIDGED) 80 (1981) (defining "and" to mean "along with or together with . . . added to or linked to . . . as well as."). New York courts also interpret "and" as conjunctive. *BOKF, N.A. v. Caesars Entm't Corp.*, 162 F. Supp. 3d 243, 246 n. 5 (S.D.N.Y. 2016) (citing *Sasson v. TLG Acquisition LLC*, 9 N.Y.S.3d 2, 4 (N.Y. App. Div. 2015); *Progressive Ne. Ins. Co. v. State Farm Ins. Cos*., 916 N.Y.S.2d 454, 456-57 (N.Y. App. Div. 2011); *Maxwell v. State Farm Mut. Auto. Ins. Co.*, 461 N.Y.S.2d 541, 543-44 (N.Y. App. Div. 1983)).

Furthermore, reading "and" to mean "or" would violate a basic principle of contract interpretation. In interpreting a contract under New York law, "an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.'" *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (quoting *Shaw Grp., Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 124 (2d Cir. 2003)); *accord Olin Corp. v. OneBeacon Am. Ins. Co.*, 864 F.3d 130, 148 (2d Cir. 2017); *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992). Reading the relevant clause as "with respect to this Agreement *or* the Fund" would render "this Agreement" superfluous because any

possible dispute between a shareholder and the Fund would necessarily be "with respect to" the Fund.

Accordingly, the forum selection clause covers claims and disputes "with respect to" the Subscription Agreement *and* "with respect to" the Fund.  The Defendants concede that the actions are "with respect to" the Funds, (*see Defendants Reply* at 11), and the remaining inquiry is whether they are also "with respect to" the Subscription Agreements.

### 2.    "With Respect to" the Subscription Agreements

The Subscription Agreement refers to several different Fund-related documents.  In some cases, the parties' rights are subject to all of these documents.  Thus, the "Subscriber subscribes for the Shares pursuant to the terms herein, the [Confidential Private Placement] Memorandum[20] and the Fund's Memorandum of Association and Articles of Association (collectively, the "Fund Documents")."  (Subscription Agreement ¶ 1.)  "If the Fund accepts this subscription, Subscriber shall become a shareholder of the Fund and be bound by the Fund Documents."  (Subscription Agreement ¶ 2.)  In addition, "Subscriber understands that the Fund may compulsorily repurchase such Shares in accordance with the Fund Documents."  (Subscription Agreement ¶ 5(a).)  In other cases, those rights are defined by or they are referred for informational purposes to specific Fund Documents.  For example, "Subscriber acknowledges that reoffers, resales or any transfer of the Shares is subject to the limitations imposed by the Fund's

---

[20]    A copy of the Confidential Private Placement Memorandum ("Memorandum") is attached as Exhibit C to the *Declaration of David J. Molton in Further Support of Motion for Leave to Amend and in Opposition to Defendants' Motion to Dismiss*, signed Mar. 31, 2017 (ECF Doc. # 1337).

Articles of Association." (Subscription Agreement ¶ 5(a).) Furthermore, "Subscriber is aware of the limited provisions for redemptions and has read the section in the Memorandum entitled 'Transfers, Redemptions and Terminations.'" (Subscription Agreement ¶ 9.)[21] If a Subscriber enters into a swap with a third party based in whole or part on the Fund's performance, the Subscriber warrants that "the Third Party has received and reviewed a copy of the Memorandum and the Agreement." (Subscription Agreement ¶ 27.) Lastly, the "Subscriber has received and reviewed the country-specific disclosures in the Memorandum." (Subscription Agreement ¶ 28.)

Certain provisions, on the other hand, refer solely to the Subscription Agreement, and do not have any bearing on the Fund Documents. For example, if the Fund rejects a subscription, it must promptly return the Subscriber's funds, "and this Agreement shall be void." (Subscription Agreement ¶ 2.) Obviously, the Fund Documents do not become void; rather, they don't apply to the non-Subscriber. In addition, "[t]his Agreement shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions." (Subscription Agreement ¶ 16.) Equally obvious, the reference to the Subscription Agreement does not mean that all of the Fund Documents, including the Articles, are governed by New York law.

The forum selection clause at issue falls into this last category. While the phrase "with respect to" is broad and synonymous with "in relation to," "in connection with," "associated with," and "with reference to," *see Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128-29 (2d Cir. 2001) (Sotomayor, J); *cf. Lamar, Archer & Cofrin,*

[21] The referenced section in the Memorandum deals with, among other things, the mechanics of redemption. (*See* Memorandum at 23-25.)

*LLP v. Appling*, 138 S. Ct. 1752, 1760 (2018) ("Use of the word 'respecting' in a legal context generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject."), the Liquidators' interpretation essentially substitutes "Fund Documents" for "Agreement," making all disputes between a Subscriber and the Fund subject to the forum selection clause regardless of their nature. This interpretation ignores the distinctions made within the Subscription Agreement between and among the various Fund Documents, and which Fund Documents obligate or inform the Subscriber.

Furthermore, the Privy Council in *Migani* impliedly if not expressly rejected the Liquidators' argument that their claw back claims were "with respect to" the Subscription Agreements. The Liquidators argued before the Privy Council "that the effect of the contractual provisions governing redemption was not covered by the preliminary issues and ought to be referred back to the [BVI Court]," and "also suggested that at a further hearing in the [BVI Court], New York law, which is the proper law of the Subscription Agreement, might be relevant." *Migani* ¶ 20. Having concluded that the terms of the redemption of shares were found in the Articles rather than the Subscription Agreement, *id.* ¶ 10, the Privy Council "unhesitatingly reject[ed]" the Liquidators' suggestion:

> Nor can the Board discern any basis on which New York law could be relevant, since none of the questions raised by the preliminary issues depends on the terms of the Subscription Agreement. They depend wholly on the construction of the Articles, which is governed by the law of the British Virgin Islands.

*Id.* ¶ 20.

In essence, the Privy Council held that the Subscription Agreement was irrelevant to actions to recover the inflated redemption payments. To nevertheless construe the Liquidators' claims in the U.S. Redeemer Actions to be "with respect to" the very agreements that the Privy Council judged to be irrelevant would lead to the same surplusage problem noted above, and more importantly, require the application of New York law to resolve the redemption dispute, an argument expressly rejected by the *Migani* court.

Finally, the Liquidators argue that the forum selection clause should apply because the Articles and the Subscription Agreement form an "integrated contract." (*Liquidators Reply* at 9-10.) "Generally, separate writings are construed as one agreement if they relate to the same subject matter and are executed simultaneously." *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 53 (2d Cir. 1993) (listing cases); *accord Carvel Corp. v. Diversified Mgmt. Grp., Inc.*, 930 F.2d 228, 233 (2d Cir. 1991) ("Under New York law, instruments executed at the same time, by the same parties, for the same purpose and in the course of the same transaction will be read and interpreted together."); *cf. Ripley v. Int'l Rys. of Cent. Am.*, 171 N.E.2d 443, 446 (N.Y. 1960) ("The circumstance that they are different documents does not necessarily mean that they do not form a single contract (*Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 110 N.E.2d 551), but it does indicate that they are separate unless the history and subject matter shows them to be unified."). Documents executed at different times may still be construed as a single contract if "the parties assented to all the promises as a whole, so that there would have been no bargain whatever if any promise or set of promises had been stricken." *Commander Oil,* 991 F.2d at 53 (quoting

6 SAMUEL WILLISTON, WILLISTON ON CONTRACTS § 863, at 275 (3d ed. 1970)); *accord TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 90 (2d Cir. 2005) (same), *cert. denied*, 548 U.S. 904 (2006).

This is a variation of the argument rejected in *Migani*. All of the Fund Documents are linked to the extent that they dealt with the Subscriber's investment in the Funds. However, while the Subscription Agreement governs subscriptions and refers to the Articles, the Articles govern redemptions and make no mention of the Subscription Agreement. If the Articles and the Subscription Agreement were an integrated, single agreement, the New York law and venue provisions would govern the redemption claims. The *Migani* court, however, ruled that the Articles and BVI law governed and the Subscription Agreement and New York law were irrelevant to the claw back claims. Accordingly, the Defendants' consent to the Subscription Agreement does not constitute consent to personal jurisdiction in the U.S. Redeemer Actions.

I must stop here. The issue of personal jurisdiction is traditionally treated as a threshold question that must be resolved prior to a consideration of the merits. *In re Rationis Enters., Inc. of Pan.*, 261 F.3d 264, 267–68 (2d Cir. 2001). However, the practice is prudential and does not restrict a court's power to address legal issues, at least in a case involving multiple defendants where the court indisputably has jurisdiction over some of the defendants and all of the defendants collectively challenge the legal sufficiency of the plaintiff's cause of action, particularly where the personal jurisdictional challenges are based on factual allegations that must await future development. *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 n.6 (2d

Cir. 2013); *see Chevron Corp. v. Naranjo*, 667 F.3d 232, 246 n. 17 (2d Cir.), *cert. denied*, 568 U.S. 958 (2012).

The Court's disposition of the effect of the forum selection clause in the Subscription Agreement does not resolve the Foreign Defendants' jurisdictional objections. The question is whether the Court should go further at this point and reach the merits of the Liquidators' claims. On the one hand, the Defendants in the 305 adversary proceedings collectively challenge the Liquidators' claims, and the factual disputes relating to the issues of personal jurisdiction will take time to develop. On the other hand, I cannot conclude on the state of this record that I indisputably have personal jurisdiction over at least one defendant in each of the 305 adversary proceedings, and it may be that I have no personal jurisdiction over any of the Defendants in some of the adversary proceedings.

Before going any further and reaching the merits of the Liquidators' claims, the Court will hear from the parties regarding the appropriate way to proceed. Upon further analysis, I may indisputably have personal jurisdiction over at least one defendant in every adversary proceeding. If not, it may make sense to carve out the cases where at least one defendant is indisputably subject to the Court's jurisdiction, and limit the decision on the motions to those cases. A more efficient procedure may be the agreement by the Foreign Defendants to be bound by the Court's determination of the motions, without otherwise waiving any objections to personal jurisdiction. The parties may have other ideas or suggestions.

Accordingly, the parties are directed to contact chambers to schedule a hearing at which to consider the appropriate way to proceed.

So ordered.

Dated:  New York, New York
        August 6, 2018

                                    /s/ *Stuart M. Bernstein*
                                    STUART M. BERNSTEIN
                                    United States Bankruptcy Judge